**Franklin E. DAWSON, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–5065.**

Court of Appeals of Alaska.

March 31, 1995.

Rehearing Denied April 14, 1995.

Rex Lamont Butler, Anchorage, for appellant.

Kenneth M. Rosenstein, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

### OPINION

BRYNER, Chief Judge.

Franklin E. Dawson was convicted by a jury of two counts of delivering cocaine, in violation of AS 11.16.110(2)(B) and AS 11.71.030(a)(1) (misconduct involving a controlled substance in the third degree), and five counts of maintaining a residence used for the distribution of cocaine, in violation of AS 11.71.040(a)(5) (misconduct involving a controlled substance in the fourth degree). Superior Court Judge Rene J. Gonzalez sentenced Dawson to three years' imprisonment on each of the delivery counts and ordered the sentences to run concurrently with one another. On each of the maintaining charges, the judge sentenced Dawson to two

years' imprisonment, all suspended, and ordered these sentences to run concurrently with one another but consecutively to the sentences imposed on the delivery counts. Judge Gonzalez also imposed a special condition of probation restricting Dawson from having any unauthorized contact with his wife following Dawson's release from prison. Dawson appeals his convictions on the maintaining charges; he also contends that his sentence is excessive and challenges the probation condition prohibiting unauthorized contact with his wife.

## FACTS

On five occasions during November and December, 1992, an undercover police officer purchased cocaine from Dawson and/or Dawson's wife. The first sale occurred in an Anchorage apartment on 26th Avenue that the Dawsons rented and occupied. On that occasion Dawson allowed the undercover officer into the apartment and was present during the sale, but the sale itself was transacted by Dawson's wife. After the first sale, Dawson and his wife moved to a new apartment, on Spenard Road. The remaining four sales occurred there. Dawson was in the apartment during each transaction: on one occasion he handed the cocaine to the undercover officer; on another occasion the officer handed his payment to Dawson but received the cocaine from Dawson's wife; and on the two remaining occasions Dawson was merely present while his wife delivered the drugs and was paid.

The state charged Dawson with one count of delivering cocaine for each of the two incidents in which he actively participated. The state also charged him with five counts of maintaining a dwelling used for the keeping or distribution of cocaine—one count for each of the five sales that occurred at Dawson's two apartments. At trial, Dawson unsuccessfully moved for judgments of acquittal on the maintaining charges. He argued that Alaska's statutory prohibition against maintaining a dwelling used for the keeping or distribution of controlled substances—Alaska's crack-house statute—applies only to dwellings that are used exclusively for purposes of keeping or distributing controlled substances. Alternatively, Dawson argued that the crime of maintaining is a continuing offense and that, for this reason, he could not be convicted separately for each sale that occurred at his apartments. On appeal, Dawson renews these arguments.

## DISCUSSION

### 1. Interpretation of Alaska's Crack–House Statute

In order to resolve Dawson's claim of insufficient evidence, we must first determine the precise nature of the conduct prohibited by Alaska's crack-house statute. In relevant part, AS 11.71.040(a)(5) provides that misconduct involving a controlled substance in the fourth degree occurs when a person "knowingly keeps or maintains any store, shop, warehouse, dwelling, building, vehicle, boat, aircraft, or other structure or place which is used for keeping or distributing controlled substances in violation of a felony offense under this chapter[.]"

This provision has never been interpreted by an appellate court in Alaska;[1] it was adopted by the Alaska legislature in 1982 as part of a comprehensive revision of Alaska's drug laws. As with the balance of Alaska's revised drug laws, the crack-house provision derives from the Uniform Controlled Substances Act (UCSA). See ch. 45, § 1, SLA 1982. Similar provisions, also patterned on the UCSA, have been adopted and enforced by the federal government and in numerous states. See generally Emile F. Short, Annotation, Permitting Unlawful Use of Narcotics in Private Home as Criminal Offense, 54 A.L.R.3d 1297 (1974); Richard Belfiore, Annotation, Validity, Construction, and Application of Federal "Crack–House Statute" Criminalizing Maintaining Place for Purpose of Making, Distributing, or Using Con-

---

1. In Davis v. State, 766 P.2d 41 (Alaska App. 1988), we held that, for purposes of double jeopardy, the statutory elements of Alaska's crack-house statute, AS 11.71.040(a)(5), were sufficiently distinguishable from the elements of de-

livery of a controlled substance, AS 11.71.030(a), to allow the entry of separate convictions for both offenses. Id. at 46. We were not called upon, however, to interpret the crack-house statute or to ascertain its precise meaning.

*trolled Drugs (21 USC § 856)*, 116 A.L.R. Fed 345 (1993). The large body of decisional law that has developed in other jurisdictions provides an invaluable resource for the interpretation of Alaska's provision.[2] We consider first the elements of the offense relating to conduct, then the elements involving culpable mental state.

### a. *Elements Relating to Conduct*

A commonsense reading of AS 11.71.040(a)(5) suggests that the provision is meant to bar any person who "keeps or maintains" any type of property enumerated in the statute from personally using or permitting any other person to use that property for the purpose of keeping or delivering a prohibited controlled substance. This commonsense meaning is consistent with the purpose expressed in the legislative commentary to AS 11.71.040(a)(5), which notes: "This provision, for example, would include the landlord of a warehouse who knowingly rents to a person who uses the structure for manufacturing or distributing controlled substances illegally." Commentary and Sectional Analysis for the 1981 Revision of Alaska's Controlled Substances Laws, Journal Supp. No. 60 at 14, 1981 House Journal 2261.

Federal cases interpreting 21 U.S.C. § 856(a)(1) and (2)[3]—the federal counterpart to Alaska's crack-house statute—ascribe the same basic meaning to the federal statute, describing it as "aimed ... at persons who occupy a supervisory, managerial, or entrepreneurial role in a drug enterprise, or who knowingly allow such an enterprise to use their premises to conduct its affairs." *United States v. Thomas*, 956 F.2d 165, 166 (7th Cir.1992). Although the federal cases suggest that the primary focus of this legislation is on large-scale drug enterprises, they characterize the federal statute as "broadly worded," *id.*, and hold it applicable to situations involving even small amounts of money and drugs. *See, e.g., United States v. Robinson*, 779 F.Supp. 606, 609 n. 5 (D.D.C.1991), *rev'd on other grounds*, 997 F.2d 884 (D.C.Cir. 1993).

The federal cases likewise appear to agree that, to be covered by the federal statute, a dwelling or other building need not be used for the exclusive, or even the primary purpose of storing or distributing drugs; as long as such use is a substantial purpose, the federal prohibition applies. *See, e.g., United States v. Tamez*, 941 F.2d 770, 773–74 (9th Cir.1991) (expansive language of § 856(a)(2) does not require that sole purpose of building—in this case, a car dealership—be to store drugs or to function as a crack-house). The definition of intentional conduct adopted by Alaska's legislature supports the same conclusion; AS 11.81.900(a)(1) specifies that, "when intentionally causing a particular result is an element of an offense, that intent need not be the person's only objective."

Nevertheless, the federal cases also recognize that the federal statute describes a continuing offense—that an isolated or incidental act of possession or sale in a building will not fall within the federal statute. In *United States v. Clavis*, 956 F.2d 1079 (11th Cir. 1992), *modified on other grounds*, 977 F.2d 538 (11th Cir.1992), for example, the court considered the meaning of "maintain," as used in 21 U.S.C. § 856(a)(1), which prohibits "knowingly ... maintain[ing] any place for the purpose of manufacturing, distributing, or using any controlled substance." Finding the plain meaning of the word—which is undefined in the federal statute—applicable,

**2.** Although both parties in this case dispute the meaning and application of AS 11.71.040(a)(5), neither recognizes its derivation or provides any citation to or discussion of cases from other jurisdictions having similar provisions. Given the virtual absence of Alaska case law and the abundance of relevant decisions in other jurisdictions, the parties' exclusive reliance on Alaska case law is not to be condoned. We think it appropriate to note our disapproval of the narrow manner in which the meaning of AS 11.71.040(a)(5) has been argued by the parties in their briefs.

**3.** 21 U.S.C. § 856(a)(1) makes it a crime to "knowingly open or maintain any place for the purpose of manufacturing, distributing, or using any controlled substance"; § 856(a)(2) makes it unlawful to "manage or control any building, room, or enclosure, either as an owner, lessee, agent, employee, or mortgagee, and knowingly and intentionally rent, lease, or make available for use, with or without compensation, the building, room, or enclosure for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance."

*id.* at 1090, the court construed the word "to exclude a single, isolated act as a violation and to embrace some degree of continuity." *Id.* at 1094.

This view accords with the consensus of courts interpreting UCSA-based state crack-house statutes similar to Alaska's. These courts have uniformly adopted the position that the prosecution is required to prove, and the jury to find, "something more than a single, isolated instance of the proscribed activity." *Barnes v. State,* 255 Ga. 396, 339 S.E.2d 229, 234 (1986) (also citing and discussing like cases from California, Maryland, Rhode Island, and Indiana); *see also Meeks v. State,* 872 P.2d 936, 938–39 (Okla.Crim. 1994). At the same time, however, they recognize "that in determining the sufficiency of the evidence [on the issue of continuity], each case must be adjudged according to its own unique facts and circumstances, and there is no inflexible rule that evidence found only on a single occasion cannot be sufficient to show a crime of a continuing nature." *Id; see also Howard v. State,* 815 P.2d 679, 683 (Okla. Crim.1991).

■■■ The terminology of Alaska's crack-house provision similarly suggests the need for a finding of continuity. The statute, in broad terms, prohibits "keeping" or "maintaining" various types of property for drug-related activities; neither "keep" nor "maintain" is defined. In their ordinary meaning, both words strongly imply an element of continuity or duration.[4] We conclude that the plain meaning of "keep" and "maintain" should govern the application of Alaska's crack-house statute. In particular, we conclude that the statute must be construed to

require a finding of continuity and to preclude conviction for an isolated incident of possession or distribution. In keeping with other jurisdictions, however, we further conclude that the existence of continuity presents a factual issue to be decided in light of the totality of the facts in each case: "there is no inflexible rule that evidence found only on a single occasion cannot be sufficient to show a crime of a continuing nature." *Barnes,* 339 S.E.2d at 234.

■■■ In another respect, however, applying the plain meaning of "keep" and "maintain" must be avoided. The common meaning of these words might include activities such as routine maintenance or upkeep of property; but the context in which these words are used in AS 11.71.040(a)(5) indicates that the statute demands a showing of something more. The central goal of Alaska's crack-house statute, as we have already noted, is to prohibit persons from personally using or permitting others to use various types of property, enumerated in the statute, for the purpose of keeping or distributing controlled substances. This statutory goal necessarily presupposes that, for a person to "keep" or "maintain" a structure in violation of the crack-house statute, the person must control or have authority to control the use or occupancy of the structure.

Illustrative of the point is *State v. Pyritz,* 90 Or.App. 601, 752 P.2d 1310 (1988). In *Pyritz,* the Oregon Court of Appeals rejected a claim of vagueness brought against an Oregon statute prohibiting keeping, maintaining, frequenting, or remaining at a place "while knowingly permitting persons to use con-

---

4. "[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979) (citation omitted); *see Fagan v. State,* 779 P.2d 1258, 1260 (Alaska App.1989). *Webster's II New Riverside University Dictionary* 717 (2d ed. 1988) defines "maintain" as

  1. To continue: carry on 2. To preserve or keep in a given existing condition, as of efficiency or good repair 3. a. To provide for b. To keep in existence: sustain 4. To defend, as against danger or attack 5. To declare to be true: affirm[.]

The same dictionary defines "keep" in relevant part:

  1. To retain possession of 2. To have as a supply 3. To provide with maintenance and support 4. To put customarily 5. a. To supply with room and board for a fee b. To raise 6. To maintain for use or service 7. To manage, tend, or have charge of 8. To preserve 9. To cause to continue in a given state or course of action 10. a. To maintain records in b. To enter (data) in a book 11. a. To detain b. To restrain c. To refrain from divulging d. To save in reserve 12. To maintain 13. To adhere to: fulfill 14. To celebrate: observe.

*Id.* at 662.

trolled substances in such place or to keep or sell them[.]" In so doing, the court construed the undefined word "permitting" to mean "that one who, (1) having legal authority over persons who use, keep, or sell illegal controlled substances, at the specified place . . ., (2) authorizes or consents to such use, possession, or sale." *Id.* 752 P.2d at 1313 (footnote omitted). In support of this definition, the court observed: "Before one can be said to 'permit' something, one must have authority to forbid it." *Id.*[5] *See Clavis*, 956 F.2d at 1091 (approving district court's instruction stating that "the term [maintain] does contemplate that a defendant exercise some degree of control over the premises and knowingly made such place available for the use alleged in the indictment"); *Meeks*, 872 P.2d at 939 (adopting instruction defining "keeping or maintaining," as used in Oklahoma's crack-house statute, to require "that the defendant have control, ownership, or management of the residence, structure, or vehicle, as distinguished from other persons resorting to it to buy or use controlled dangerous substances in violation of this act").

■ A final observation to be made with regard to the actus reus elements of the crack-house statute pertains to the type of drug-related activities that must occur on the property that is kept or maintained by the accused. The language of the statute specifies that the property must be used "for keeping or distributing controlled substances in violation of a felony offense under this chapter[.]" This simply requires that the property be used for the purpose of keeping or distributing drugs in a manner that amounts to a felony under Alaska's drug laws; use for purposes of committing misdemeanor-grade controlled substance offenses is excluded from the language of the crack-house statute.

### b. *Elements Relating to Culpable Mental State*

■ The culpable mental state requirement of Alaska's crack-house statute must

next be considered. The culpable mental state specified in the crack-house statute is "knowingly." Alaska Statute 11.71.040(a)(5) provides that a violation occurs when the accused "knowingly keeps or maintains" property used for drug-related purposes. While this provision makes it clear that the accused must knowingly keep or maintain property that is illegally used, it is less than clear in specifying whether the accused must actually know that the property is being used illegally when the illegal use is carried on by other persons. We conclude that awareness of the illegal use is required. Just as one must have authority to forbid something before one can be said to permit it, *Pyritz*, 752 P.2d at 1313, so "one cannot be said to have permitted a thing of which he has no knowledge or means of knowledge[.]" *Id.* (quoting *Lemery v. Leonard*, 99 Or. 670, 196 P. 376 (1921)).

Our conclusion is reinforced by the prevailing federal interpretation of 21 U.S.C. § 856(a)(2), whose culpable mental state requirement is worded similarly to Alaska's. The federal statute makes it unlawful to "manage or control any building, room, or enclosure, either as an owner, lessee, agent, employee, or mortgagee, and knowingly and intentionally rent, lease, or make available for use, with or without compensation, the building, room, or enclosure for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance." This provision has been interpreted to mean that "the defendant is liable if he manages or controls a building that others use for an illicit purpose, and he either knows of the illegal activity or remains deliberately ignorant of it." *United States v. Banks*, 987 F.2d 463, 466 (7th Cir.1993); *see United States v. Chen*, 913 F.2d 183, 190 (5th Cir.1990).

While liability for remaining "deliberately ignorant" of illegal activity might at first blush suggest a culpable mental state re-

---

**5.** The court in *Pyritz* further made it clear, however, that permission may be given by implied consent, and that express consent or authorization need not be shown. To make this point, the court relied on a definition of "permit" adopted in a 1921 Oregon Supreme Court case, *Lemery v.*

*Leonard*, 99 Or. 670, 196 P. 376 (1921): "To 'permit' means to allow by tacit consent or by not hindering, taking no steps to prevent, or to grant leave by express consent or authorization." *Pyritz*, 752 P.2d at 1313.

quirement entailing something less than actual knowledge—something more akin to recklessness—closer scrutiny dispels the notion. Under AS 11.81.900(a)(2),

> a person acts "knowingly" with respect to conduct or to a circumstance described by a provision of law defining an offense when the person is aware that the conduct is of that nature or that the circumstance exists; when knowledge of the existence of a particular fact is an element of an offense, that knowledge is established if a person is aware of a substantial probability of its existence, unless the person actually believes it does not exist[.]

In our view, one who remains "deliberately ignorant of [illegal activity]," *Banks*, 987 F.2d at 466, is necessarily "aware of a substantial probability of its existence," and so, acts "knowingly" under AS 11.81.900(a)(2). The commentary to AS 11.81.900(a)(2) confirms this conclusion:

> Under the Code, knowledge requires an awareness on the part of the defendant that his conduct is of the nature described by the statute defining the offense or that the circumstances described by the statute exist. The definition also covers the situation where a person deliberately avoids acquiring knowledge by closing his eyes (sometimes referred to as "wilful blindness") by providing that "when knowledge of the existence of a particular fact is an element of an offense, that knowledge is established if a person is aware of a substantial probability of its existence, unless he actually believes it does not exist."

Commentary on the Alaska Revised Criminal Code, Senate Journal Supp. No. 47 at 141, 1978 Senate Journal 1399.

■■■ Hence, we conclude that, under Alaska's crack-house statute, the accused must act knowingly both with respect to the proscribed conduct of keeping or maintaining property that is used for the purpose of illegal storage or distribution of controlled substances and with respect to the existence of the illegal use itself. We emphasize, however, that when the accused keeps or maintains property and allows others to use it for the purpose of drug-related activities, the state need not prove that the accused acted intentionally.[6] That is, the accused need not share the illegal purpose of those who carry on the drug-related activity, but need only know of it—"the 'purpose' may be that of others." *Banks*, 987 F.2d at 466.[7]

### c. *Summary of Elements*

To summarize, we conclude that, to establish a violation of AS 11.71.040(a)(5), the state must prove that the accused, while knowingly controlling or knowingly having authority to control property of the type listed in the statute, personally used the property or knowingly permitted[8] another person to use it for the purpose of keeping or distributing prohibited controlled substances in a manner that amounts to a felony under Alaska law. The state need not prove that the property was used for the exclusive purpose of keeping or distributing controlled substances, but such use must be a substantial purpose of the users of the property, and the use must be

---

6. When the accused maintains the property and is also the one who uses it illegally, then this distinction between knowing and intentional conduct becomes superfluous, since an accused person who maintains property and personally uses it for drug-related activities will always act intentionally with respect to both the proscribed use and the conduct of maintaining the property.

7. A useful illustration of this distinction is the disparate manner in which the federal courts interpret subsections (a)(1) and (a)(2) of 21 U.S.C. § 856. As our discussion in the text indicates, subsection (a)(2), whose culpable mental state requirement is similar to Alaska's, is interpreted to require that the accused know of and permit the use of property for an illegal purpose, but does not require the accused to share the

purpose. In contrast, subsection (a)(1) of the federal statute, which applies when the accused "knowingly open[s] or maintain[s] any place *for the purpose of*" illegal drug-related activity (emphasis added) is interpreted to require that the accused act knowingly with respect to the conduct of maintaining, and intentionally with respect to the illegal use of the premises opened or maintained. *See Chen*, 913 F.2d at 189–190. It has thus been held that subsection (a)(1) "requires two mental elements, knowledge and purpose." *Clavis*, 956 F.2d at 1090.

8. We use the word "permits" in this context in an ordinary and commonsense manner to mean allowing by express or tacit consent, or by a failure to take steps to hinder or prevent when such steps are available.

continuous to some degree; incidental use of the property for keeping or distributing drugs or a single, isolated occurrence of drug-related activity will not suffice. The purpose with which a person uses property and whether such use is continuous are issues of fact to be decided on the totality of the evidence in each case; the state is not required to prove more than a single specific incident involving the keeping or distribution of drugs if other evidence of continuity exists.

### 2. Application of the Crack–House Statute to Dawson's Case

We now consider Dawson's claim of insufficient evidence in light of this interpretation.[9] Dawson's primary basis for claiming insufficient evidence—that his apartments were not exclusively used for drug trafficking—is meritless. As we have indicated, exclusive use is not required.

Viewing the totality of the evidence in the light most favorable to the state, sufficient evidence was presented to allow reasonable jurors to conclude that Dawson exercised control over the apartments that he and his wife rented and lived in, and that he rented the apartments to be used for the purpose of keeping and distributing of cocaine—conduct amounting to a felony.[10] Moreover, because there was ample evidence of Dawson's personal participation in two cocaine sales, the jury could certainly find that Dawson acted knowingly both with respect to maintaining the apartments and with respect to the illegal activities that occurred there. Since the evidence showed a series of sales occurring over a two-month span, it was also sufficient to support a finding of continuous drug-related activity. Accordingly, sufficient evidence was presented at trial to support a finding that Dawson violated AS 11.71.040(a)(5).

And since Dawson rented two separate apartments during the period of time covered by the evidence, the evidence could conceivably have supported his conviction for two separate acts of keeping or maintaining.

Nevertheless, because the crack-house statute defines a continuing offense, and since the evidence in this case establishes at most two separate acts of keeping or maintaining a dwelling,[11] Dawson's guilt of five separate violations of AS 11.71.040(a)(5) is not supported by the evidence. Furthermore, because each of Dawson's five alleged violations of the crack-house statute was based on an isolated drug sale, and because full and accurate instructions on the elements of this offense were not given at trial, Dawson's jury was never required to decide, or even to consider, whether his use of the apartments for keeping or distributing cocaine was in fact a continuing use, or whether it merely amounted to a series of isolated transactions that were incidental to Dawson's presence in the apartments.

That the evidence plainly would have supported a finding of continuing, purposive use cannot cure the problem created by the jury's failure to decide the issue. Despite the theoretical sufficiency of the evidence to support Dawson's conviction for two violations of the crack-house statute, the verdicts of conviction on the crack-house violations do not represent the jury's determination of all of the necessary elements of the offense. Under the circumstances, even though Dawson failed to object to the jury instruction covering the elements of the offense, we conclude that allowing Dawson's convictions to stand on even two of the crack-house counts would amount to plain error. Dawson's convictions on the five crack-house counts must be vacated.

9. In reviewing a claim of insufficient evidence, we must consider the evidence and the inferences to be drawn from it in the light most favorable to the state and determine if "fair-minded jurors in the exercise of reasonable judgment could differ on the question of whether guilt had been established beyond a reasonable doubt." *Pavlik v. State,* 869 P.2d 496, 497 (Alaska App.1994) (citations omitted).

10. *Compare, e.g., Bridges v. State,* 878 S.W.2d 781, 783 (Ark.App.1994), and *Ramey v. State,* 42 Ark.App. 242, 857 S.W.2d 828, 831–32 (1993), *with Holmes v. State,* 583 N.E.2d 180 (Ind.App. 1991).

11. *Cf. United States v. Cooper,* 966 F.2d 936, 942–45 (5th Cir.1992) (approving multiple conviction when evidence showed that a crack-house was repeatedly raided, closed, and reopened).

### 3. *Sentencing Issues*

■ Our ruling leaves intact Dawson's convictions and sentences for delivery of cocaine; we must consider his sentencing arguments relating to those counts.[12] Dawson claims that, because he is a first felony offender, his three-year sentence for delivery of cocaine is excessive. However, delivery of cocaine constitutes misconduct involving a controlled substance in the third degree; as such, the offense is a class B felony and is punishable by a maximum term of ten years and by a second offense presumptive term of four years. AS 11.71.030(c); AS 12.55.125(d) & (d)(1). Since Dawson's sentence falls well below the second offense presumptive term, it is within the permissible range of sentences prescribed by *Austin v. State*, 627 P.2d 657 (Alaska App.1981). For typical first offense convictions involving commercial sales of small quantities of cocaine, this court has routinely upheld sentences of two years, even if the defendant has shown exceptionally good prospects for rehabilitation. *See Major v. State*, 798 P.2d 341, 344 (Alaska App.1990); *Smith v. State*, 767 P.2d 211, 214 (Alaska App.1989). Given the clearly commercial nature of Dawson's involvement in cocaine trafficking and his extensive history of misdemeanor convictions, a first offense sentence of three years is not clearly mistaken. *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

■ Dawson also challenges as unwarranted the special condition of probation that forbids him from having any contact with his wife unless the contact is approved by his probation officer. Dawson argues that to require all contact with his wife to be supervised or approved by a probation officer is a "virtual annulment of his marriage."

In the present case, the sentencing court evidently first decided to restrict Dawson's contact with his wife because the court had been informed that the Dawsons were separated and contemplating divorce. Nevertheless, when informed that the Dawsons' marriage remained intact, the court declined to rescind the restriction. The court found the restriction necessary because Dawson's wife had been involved equally in dealing crack with Dawson, and the court had no information as to the extent of her substance abuse problem or as to her prospects for rehabilitation.

In *Thomas v. State*, 710 P.2d 1017, 1019 (Alaska App.1985), we stated:

> [C]onditions of probation must be "reasonably related to the rehabilitation of the offender and the protection of the public and ... not unduly restrictive of liberty." *Roman v. State*, 570 P.2d 1235, 1240 (Alaska 1977); *Edison v. State*, 709 P.2d 510, 511 (Alaska App.1985). Conditions which restrict constitutional rights are subject to special scrutiny to determine whether the restriction serves the goals of rehabilitation of the offender and protection of the public. *Roman*, 570 P.2d at 1241.

A condition of probation restricting marital association plainly implicates the constitutional rights of privacy, liberty and freedom of association and, under *Thomas*, must be subjected to special scrutiny. While discouraging a probationer from associating with former partners in crime is obviously related to the goal of rehabilitation, precluding association between marital partners is just as obviously an extreme restriction of liberty, even when the marital partners were once partners in crime. In certain types of cases, such as cases involving domestic violence, limiting marital association would plainly be defensible.[13] In any type of case, it is conceivable that such a limitation might be justified by case-specific circumstances demonstrating actual necessity and the lack of less

---

12. Given our reversal of the crack-house counts, we need not consider Dawson's remaining arguments relating to those offenses. We likewise need not address Dawson's argument that double jeopardy bars consecutive sentencing on the crack-house and delivery of cocaine charges. Dawson has not challenged his convictions for delivery of cocaine, only his sentence. Dawson also challenges the crack-house statute on equal protection grounds. To the extent his challenge

is not based on a misinterpretation of the statutory elements, we find the challenge meritless.

13. *See, e.g., State v. Gilkey*, 111 Or.App. 303, 826 P.2d 69 (1992) (condition of probation that defendant not contact wife without probation officer or court's permission appropriate where defendant convicted of harassing wife).

restrictive alternatives. In such a case, however, to avoid unnecessary intrusion on marital privacy, it would seem appropriate to tailor a close fit between the scope of the order restricting marital association and the specific needs of the case at hand.

Here, the sentencing court did not question the existence of a bona fide marital relationship.[14] Other special conditions of probation imposed by the court required Dawson to refrain from using and possessing all controlled substances, to submit to drug testing when asked by his probation officer, to participate in substance abuse treatment if deemed necessary, to submit to substance abuse evaluation and comply with all recommendations, and not to have any contact with codefendants other than his wife. The court did not specify why it considered these additional restrictions to be insufficient to address its concerns for Dawson's success as a probationer. Finally, the court made no apparent effort to tailor the scope of the marital association restriction to the specific circumstances of Dawson's case. Instead, the disputed condition delegates to Dawson's probation officer unconditional and unlimited authority to regulate Dawson's marital relationship.

We are unprepared to say that a narrower, better tailored, and more fully explained restriction would not be justified in Dawson's case. But we conclude that, as imposed, the challenged condition is unduly restrictive of liberty and cannot withstand scrutiny. Accordingly, the condition must be vacated. Upon remand, the superior court may, in its discretion, consider the appropriateness of a more limited special condition.

### CONCLUSION

Dawson's convictions for misconduct involving a controlled substance in the third degree are AFFIRMED. Except as to the special condition of probation restricting marital contact, his sentences for these offenses are also AFFIRMED. Dawson's convictions for misconduct involving a controlled substance in the fourth degree are RE-

VERSED. This case is REMANDED for further proceedings consistent herewith.

---

**14.** *Cf. United States v. Bortels,* 962 F.2d 558 (6th Cir.1992); *State v. Davis,* 107 Idaho 215, 687 P.2d 998 (App.1984); *State v. Donovan,* 116 Ariz. 209, 568 P.2d 1107 (App.1977) (all approving relatively broad restrictions in cases dealing with fiancés or girlfriends).