**Bret F. MANESS, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–7292.**

Court of Appeals of Alaska.

July 12, 2002.

---

**5.** *Hertz v. State*, 755 P.2d 406, 410 (Alaska App. 1988) (concurring opinion of Bryner, C.J.).

Donna J. McCready, Ashburn and Mason, P.C., Anchorage, for Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

COATS, Chief Judge.

In November 1997, Bret F. Maness killed Delbert White during a confrontation in front of Maness's apartment. While the reasons for the confrontation are disputed, it is clear

that on November 21, 1997, White went to Maness's apartment with a two-by-four to confront Maness. Maness lived in a ground-level apartment with his wife, Tina Maness. A friend, Paul Hackett, lived in the apartment below the Manesses. Maness was in his apartment with Hackett when White arrived at his door. In the subsequent confrontation, which started in Maness's residence and ended in the driveway, Maness shot White. When police and paramedics arrived at the scene, White was lying in a pool of blood. The paramedics took White to a hospital, and the police took Maness and Hackett into custody. The police entered both Maness's and Hackett's apartments to look for other possible victims or suspects. When the police entered Maness's apartment, they saw weapons and marijuana plants. The police applied for a search warrant based on their observations and seized evidence.

The incident resulted in Maness being charged with murder in the first degree [1] for killing White, second degree misconduct involving weapons [2] (possession of a firearm during the commission of a felony drug offense), and four counts of misconduct involving a controlled substance in the fourth degree [3] for:

a) maintaining a structure used for keeping or distributing controlled substances,[4]

b) possessing one pound or more of marijuana,[5]

c) possessing with intent to deliver one ounce or more of marijuana,[6] and

d) possessing twenty-five or more marijuana plants.[7]

Maness defended the murder charge by contending that he acted in self-defense. The jury acquitted Maness of the murder charge and all lesser offenses that arose out of the death of White. But the jury convicted Maness of possession of a firearm during the commission of a felony drug offense and

two counts of misconduct involving a controlled substance in the fourth degree: one for maintaining a structure used for keeping or distributing a controlled substance and a second for possession of one pound or more of marijuana. The jury acquitted Maness of the other drug charges.

Judge Souter sentenced Maness to a composite sentence of eight years with three suspended: six years with two years suspended for possessing a firearm during the commission of a felony drug offense and two years with one year suspended on each conviction of misconduct involving a controlled substance in the fourth degree (to run consecutively to the weapons possession sentence). Maness appeals his convictions, raising several arguments. We reverse Maness's conviction for possession of a firearm during a felony drug offense. We otherwise affirm his convictions.

### Maness's motion to suppress evidence that the police obtained from entering his residence

■ Following his indictment, Maness filed a motion to suppress the evidence the police obtained when they entered his residence. The state contended that the search was justified by the protective sweep exception to the warrant requirement—that the police needed to enter Maness's residence because they had reasonable cause to believe that their safety was in danger from additional suspects who posed a threat to officers at the scene. The state also claimed that the search was justified by the emergency aid exception to the warrant requirement—that the police needed to search Maness's residence to make sure other people had not been injured. Following an evidentiary hearing, Judge Souter accepted the state's contention that the search was justified because the police had reasonable cause to believe that their safety was in danger, and

1. AS 11.41.100(a)(1)(A).

2. AS 11.61.195(a)(1); AS 11.16.110(2)(B).

3. AS 11.71.040(a).

4. AS 11.71.040(a)(5); AS 11.16.110(2)(B).

5. AS 11.71.040(a)(3)(F); AS 11.16.110(2)(B).

6. AS 11.71.040(a)(2); AS 11.16.110(2)(B).

7. AS 11.71.040(a)(3)(G); AS 11.16.110(2)(B).

thus was permissible under the protective sweep exception. Therefore he denied Maness's motion to suppress. Judge Souter, however, rejected the state's contention that the search was justified under the emergency aid exception. Maness appeals Judge Souter's denial of his motion to suppress.

■ In Alaska, to prove a search falls within the protective sweep exception to the warrant requirement, the state must prove that:

1) before engaging in the search, the officers had reasonable cause to believe that their safety was in danger because additional suspects—beyond those under police control—were present and posed a threat to the officers and

the search was narrowly limited to areas where the officers could find dangerous persons.[8]

Judge Souter found credible the police testimony that their safety was in danger and their search was narrowly limited. At that hearing, Anchorage Police Officer Richard Jensen testified that he received a message from the dispatcher that a shot had been fired and that an individual was injured at 3804 Lois Drive. As he approached the scene, a uniformed security guard, Edward Spencer, pointed to the scene and said that a crazy man was down the street with a shotgun. Jensen proceeded to the scene and saw Maness with a rifle. Officer Jensen pointed his handgun at Maness and ordered him to drop the gun, which Maness did. Jensen and other officers saw White lying face down on the driveway in a large pool of blood. The police took Maness and Hackett into custody, and paramedics arrived to treat White. According to Lt. William Gifford, the police also had been told that earlier someone in Maness's residence had been shooting towards another residence with a pellet gun or a .22 and that White had come over to Maness's residence because of this earlier shooting incident. Lt. Gifford made the decision to enter the two apartments at 3804 Lois Drive because he was concerned that other armed suspects might be in the apartments or that there might be additional victims.

Judge Souter concluded that this information justified the police entering Maness's and Hackett's apartments, which were adjacent to the driveway. He found the police had information of an earlier shooting incident and a report of a crazy man with a shotgun. This information gave the police reasonable cause to believe that their safety was in danger because additional suspects might be within the apartments. He also found that the officers had narrowly limited their search to a reasonable area. And he found it was reasonable for the police to have entered the residences thirty minutes after they had arrived at the scene because the officers had several different things that required their attention before they could search—a victim who was dying, a crowd forming, and other officers arriving at the scene. Judge Souter concluded the thirty-minute wait did not undermine the contention that the search was necessary for officer safety.

We conclude that Judge Souter did not err in denying Maness's motion to suppress. His findings support the conclusion that the police had reasonable grounds to conduct a protective sweep of Maness's residence.

### The instruction on misconduct involving weapons in the second degree

■ The jury convicted Maness of misconduct involving weapons in the second degree. Alaska Statute 11.61.195(a)(1) prohibits the possession of a firearm during the commission of a felony drug offense:

(a) A person commits the crime of misconduct involving weapons in the second degree if the person knowingly

(1) possesses a firearm during the commission of an offense under AS 11.71.010–11.71.040 [misconduct involving a controlled substance in the first, second, third, and fourth degrees].

This case is controlled by *Collins v. State*.[9] In *Collins*, we concluded that in enacting AS

8. *See Earley v. State*, 789 P.2d 374, 376 (Alaska App.1990); *Murdock v. State*, 664 P.2d 589, 596 (Alaska App.1983); *State v. Spietz*, 531 P.2d 521, 525 (Alaska 1975).

9. 977 P.2d 741, 752–53 (Alaska App.1999).

11.61.195(a)(1), the legislature did not intend to criminalize every situation where a person simultaneously commits a felony drug offense and possesses or exercises control over a firearm.[10] We concluded that "AS 11.61.195(a)(1) requires proof of a nexus between a defendant's possession of the firearm and the defendant's commission of the felony drug offense." [11] Maness's trial occurred before our decision in *Collins*. At trial, Maness contended that the court was required to instruct the jury that a nexus must exist between the felony drug offense and the firearm possession to support a conviction. Judge Souter denied Maness's request. During closing arguments, the state argued to the jury that Maness could be convicted if he possessed firearms in his residence while he grew marijuana there, even if the firearms bore no connection to the drug offense.

On appeal, Maness points out that Judge Souter's jury instruction conflicts with our decision in *Collins*. The state argues that we should overrule *Collins*, but we decline to revisit our decision. We note that this court has continued to follow *Collins* in both *Lewis v. State*[12] and *Murray v. State*.[13]

The state also argues that the evidence presented at trial established a nexus between Maness's possession of a firearm and his drug offense of maintaining a dwelling for the purpose of keeping a controlled substance. The problem with the state's argument is that it merely establishes that a properly instructed jury could have returned a verdict favorable to the state on this count. But Judge Souter's instruction did not allow the jury to consider the nexus element of the offense. To affirm Maness's conviction, we would have to find that the error in failing to instruct the jury on the nexus element was harmless beyond a reasonable doubt.[14] We cannot do so. On the record before us, a jury reasonably could have found no connection between Maness's possession of marijuana and his possession of the firearms. Accordingly, we reverse Maness's conviction of

second-degree misconduct involving a weapon.

*The instruction on maintaining a structure used for keeping controlled substance*

 Maness argues that Judge Souter plainly erred in how he instructed the jury on the charge of maintaining a structure used for keeping controlled substances.

Alaska Statute 11.71.040(a)(5) states:

(a) Except as authorized in AS 17.30, a person commits the crime of misconduct involving a controlled substance in the fourth degree if the person

. . . .

(5) knowingly keeps or maintains any store, shop, warehouse, dwelling, building, vehicle, boat, aircraft, or other structure or place that is used for keeping or distributing controlled substances in violation of a felony offense under this chapter or AS 17.30[.]

Judge Souter instructed the jury that Maness could be convicted of violating AS 11.71.040(a)(5) if the jury found the state proved:

First, the event in question occurred at or near Anchorage and on or about November 21, 1997; and

Second, that ... Maness knowingly used or allowed another to use the ... dwelling ... for keeping or distributing controlled substances in violation of a felony offense as charged in Count V, VI or VII of the indictment; and

Third, that [Maness] knew said ... dwelling ... was used for keeping or distributing controlled substances.

Maness did not object to the jury instruction.

On appeal, Maness argues the state had to prove as an element of AS 11.71.040(a)(5) that a substantial purpose of the dwelling was for keeping or distributing controlled substances, the activity prohibited under the statute was ongoing or continuous (not a

---

**10.** *See id.* at 753.

**11.** *Id.*

**12.** 9 P.3d 1028, 1037–38 (Alaska App.2000).

**13.** 12 P.3d 784, 794–95 (Alaska App.2000).

**14.** *See Carman v. State*, 658 P.2d 131, 136 (Alaska App.1983).

single, isolated instance), and the possession of the controlled substance was not merely for personal use.

This court summarized the required elements of AS 11.71.040(a)(5) in *Dawson v. State*:[15]

> [T]o establish a violation of AS 11.71.040(a)(5), the state must prove that the accused, while knowingly controlling or knowingly having authority to control property of the type listed in the statute, personally used the property or knowingly permitted another person to use it for the purpose of keeping or distributing prohibited controlled substances in a manner that amounts to a felony under Alaska law. The state need not prove that the property was used for the exclusive purpose of keeping or distributing controlled substances, but such use must be a substantial purpose of the users of the property, and the use must be continuous to some degree; incidental use of the property for keeping or distributing drugs or a single, isolated occurrence of drug-related activity will not suffice. The purpose with which a person uses property and whether such use is continuous are issues of fact to be decided on the totality of the evidence in each case; the state is not required to prove more than a single specific incident involving the keeping or distribution of drugs if other evidence of continuity exists.[16]

It is uncontested that Maness was growing a substantial amount of marijuana. When the state stripped and dried the plants, they yielded approximately 3.7 pounds of marijuana. The evidence presented at trial established that Maness used a substantial amount of his living space to grow marijuana. Because Maness had a marijuana growing operation, it seems apparent that the presence of the marijuana in his residence was not a "single, isolated occurrence of drug-related activity" but was a continuous growing operation.

Maness points out that the jury rejected the count charging Maness with possessing marijuana for purposes of distribution. He argues that he should not be convicted of maintaining a structure used for keeping a controlled substance when the jury did not find that his possession was for anything other than personal use. But, AS 11.71.040(a)(5) prohibits knowingly keeping or maintaining a dwelling "that is used for keeping or distributing controlled substances in violation of a felony offense." The plain language of the statute appears to criminalize behavior beyond maintaining the structure for distributing controlled substances.

■ We are to find plain error only when we conclude that the error was so obvious that any competent attorney would have been aware of the issue and objected and that the defendant was obviously prejudiced by the failure to raise the issue.[17] We decline to find plain error.

In a related argument, Maness contends that the evidence the state presented at trial was insufficient to support his conviction under AS 11.71.040(a)(5) because he possessed the marijuana for his personal use. But, as we pointed out above, the statute does not restrict the crime only to instances where someone maintains a structure for purposes of distributing a controlled substance.

### *The jury instruction on misconduct involving a controlled substance in the fourth degree for possession of a pound or more of marijuana*

■ The state charged Maness with violating AS 11.71.040(a)(3)(F), which prohibits possession of "one or more preparations, compounds, mixtures, or substances of an aggregate weight of one pound or more containing a schedule VIA controlled substance." The jury found Maness guilty of this charge. Maness objects to the instruction Judge Souter gave to the jury. He points to testimony that only a small portion of the marijuana plant, "the bud," was commonly used as marijuana. He contends that under

---

**15.** 894 P.2d 672 (Alaska App.1995).

**16.** *Dawson,* 894 P.2d at 678–79 (footnote omitted).

**17.** *See Wolfe v. State,* 24 P.3d 1252 (Alaska App. 2001).

Judge Souter's instruction, the jury could have considered more than the weight of the marijuana bud in calculating the weight of a live marijuana plant under AS 11.71.040(a)(3)(F), which was error.

This issue requires analysis of three statutory sections: AS 1.71.040(a)(3)(F), AS 11.71.080, and AS 11.71.900(14). The first, AS 11.71.040(a)(3)(F), criminalizes the possession of a pound or more of marijuana. The second, AS 11.71.080, states, "For purposes of calculating the aggregate weight of a live marijuana plant, the aggregate weight shall be the weight of the marijuana when reduced to its commonly used form." And, the third, AS 11.71.900(14), defines "marijuana" as "the seeds, and leaves, buds, and flowers of the plant" but not the resin or oil from the plant, the stalks, or sterilized seeds.

Judge Souter instructed the jury:

"Marijuana" means the seeds, leaves, buds and flowers, but not the stalks or roots of the marijuana plant ... whether growing or not.

For purposes of calculating the aggregate weight of a live marijuana plant, the aggregate weight shall be the weight of the marijuana when reduced to its commonly used form.

Further, he instructed the jury that to convict Maness under AS 11.71.040(a)(3)(F), it had to find that he "knowingly possess[ed] an aggregate weight of one pound or more of ... [a] compound[] ... containing ... marijuana."

Maness contends that Judge Souter erred in giving this instruction. He argues that the testimony at trial established that only the bud of a growing marijuana plant would normally be used as marijuana. Therefore, the evidence at trial established that marijuana, when reduced to its commonly used form, is only the bud. He argues that Judge Souter erred in allowing the jury to consider the weight of other parts of the marijuana plant,

such as the leaves, when considering whether he "knowingly possess[ed] an aggregate weight of one pound or more of ... [a] compound[] ... containing ... marijuana."

We conclude that Judge Souter did not err in giving the instruction. In *Gibson v. State*,[18] we held that in determining the weight of processed marijuana, all that was necessary to convict under the statute was "that the substance delivered contains marijuana, and that the aggregate weight of the substance meets the statutory requirement."[19] We also held in *Gibson*, that the "commonly used form" language from AS 11.71.080 "refers to the method of calculating the aggregate weight of live marijuana plants."[20]

In *Atkinson v. State*,[21] we discussed the law that applies when the jury must decide the aggregate weight of live marijuana plants. We pointed out that in determining the weight of marijuana plants, the marijuana did not have "to be reduced to its purest, unadulterated statutory form; aggregate weight must instead be based on the 'commonly used form.' "[22] In *Atkinson*, we concluded that the court did not err in admitting an expert's testimony considering the aggregate weight of marijuana, even though the marijuana included stems and twigs that were not part of the statutory definition of marijuana.[23] We concluded that the weight of the marijuana was a factual question for the jury.[24]

More recently, in *Pease v. State*,[25] we again discussed what could be included in calculating the aggregate weight of live marijuana plants:

To determine whether the grower possessed one pound or more of marijuana, the police could not simply cut down the plants and weigh them. In practice, the police had to finish the job that the grower had begun—that is, they had to cut down

---

18. 719 P.2d 687 (Alaska App.1986).

19. *Id.* at 690.

20. *Id.*

21. 869 P.2d 486 (Alaska App.1994).

22. *Id.* at 494.

23. *Id.*

24. *Id.*

25. 27 P.3d 788 (Alaska App.2001).

the plants, allow them to dry, and then cut the leaves, buds, and flowers from the stalks—if they were to prosecute the grower under AS 11.71.040(a)(3)(F).[26]

Here, the state presented evidence that although the bud of the plant is the most marketable and desirable form of marijuana, the leaves of the plant have value and are used by marijuana users. Furthermore, the statutory definition of marijuana includes "the seeds, and leaves, buds, and flowers" of the marijuana plant.[27] Our prior case law is also consistent with including marijuana leaves in determining the weight of live marijuana plants. We conclude that Judge Souter did not err in giving an instruction that allowed the jury to consider the marijuana leaves as commonly used marijuana in determining the aggregate weight of the marijuana.

### Sufficiency of the evidence for the charge of possessing a pound or more of marijuana

Maness next contends that the state did not present sufficient evidence for the jury to convict him of possessing one or more pounds of marijuana. Maness renews his argument that the jury only should have considered the bud from the live marijuana plants in determining its aggregate weight. We reject that contention above. Maness also contends that some of the marijuana weight was due to non-consumable marijuana and non-marijuana objects (dimes, a nail, stalks, stems, roaches, and charred material).

The state presented evidence that the marijuana seized from Maness's apartment weighed approximately 4.18 pounds. The marijuana that was packaged with unuseable materials weighed 7.66 ounces. Therefore, excluding the packages that contained foreign objects and non-usable marijuana, the state presented evidence that Maness possessed 3.7 pounds of "usable" marijuana (excluding seeds, stems, stalks, and other non-usable portions of marijuana).

The state presented sufficient evidence for a reasonable juror to conclude beyond a reasonable doubt that Maness possessed "one or more preparations, compounds, mixtures, or substances of an aggregate weight of one pound or more containing" marijuana and that the marijuana that came from live plants had been reduced to its commonly used form.[28]

### Presentence report and sentencing issues

Maness raises several issues concerning contested items that were included in the presentence report and sentencing issues. Because we are reversing Maness's conviction for misconduct involving weapons in the second degree and remanding the case, we find it unnecessary to address these issues.

### Conclusion

Maness's conviction for misconduct involving weapons in the second degree is REVERSED. His two convictions for misconduct involving a controlled substance in the fourth degree are AFFIRMED.

MANNHEIMER, Judge, concurring.

I am writing separately to address two legal problems in this case: (1) the definition of the "commonly used form" of marijuana (the phrase used in AS 11.71.080 to define the punishable weight of live marijuana plants), and (2) whether a person who is convicted of possessing a pound or more of marijuana in their residence can also be convicted of the separate felony of maintaining a building for the keeping of controlled substances, AS 11.71.040(a)(5).

### What is the "commonly used form" of marijuana?

For purposes of criminal prosecution under AS 11.71, the legislature has defined marijuana as "the [fertile] seeds, ... leaves, buds, and flowers of the plant (genus) Cannabis, whether growing or not".[1] The police seized many marijuana plants (as well as some harvested marijuana) from Maness's

---

26. *Id.* at 788–89.

27. AS 11.71.900(14).

28. AS 11.71.040; *see* AS 11.71.080.

1. AS 11.71.900(14).

residence. Adhering to the statutory definition of marijuana, the police harvested and dried the leaves and buds from Maness's marijuana plants. After the leaves and buds were dry, they weighed 1674 grams—approximately 3 pounds, 11 ounces. Adding in the previously harvested marijuana, the State alleged that Maness possessed nearly 4 pounds of marijuana.

When a person is prosecuted for possession of marijuana, the seriousness of their offense depends on the weight of the marijuana. But for purposes of Alaska's drug statutes, the process of weighing marijuana does not involve a straightforward process of placing the seeds, leaves, buds, and flowers on a scale and seeing how much they weigh. Instead, the legislature has enacted special rules for determining the punishable weight of marijuana.

When the marijuana is in harvested form, the punishable weight includes not only the seeds, leaves, buds, and flowers themselves but also the weight of whatever else these plant parts might be mixed with. Under AS 11.71.040(a)(3)(F), a person commits the class C felony of fourth-degree controlled substance misconduct if they possess "one or more preparations, compounds, mixtures, or substances of an aggregate weight of one pound or more containing [marijuana]". As this court noted in *Gibson v. State*, 719 P.2d 687 (Alaska App.1986), this statute is worded so that the amount of actual marijuana in a compound or mixture is irrelevant. So long as the compound or mixture contains some small amount of marijuana, the person's offense will be gauged by the total weight of the compound or mixture.[2] Thus, a person who possesses two or three joints of marijuana is guilty of a class B misdemeanor,[3] but if they mix this small amount of marijuana into a milkshake or a pan of brownies, they are guilty of a class C felony.[4]

For unharvested marijuana—that is, for live plants—the legislature has provided a different method for determining the punishable weight of the marijuana. AS 11.71.080 declares that "[f]or purposes of calculating the aggregate weight of a live marijuana plant, the aggregate weight shall be the weight of the marijuana when reduced to its commonly used form." In *Atkinson v. State*, 869 P.2d 486, 494 (Alaska App.1994), this court ruled that any dispute as to what constitutes the "commonly used form" of marijuana is a question of fact to be resolved by the jury.

Here lies the point of contention. At his trial, Maness presented testimony that—at least in the current marijuana milieu—the buds are the only "commonly used" part of the marijuana plant; the leaves are considered "trash" and are thrown away.[5] Based on this testimony, and based on the fact that almost all of Maness's marijuana was in the form of live plants, Maness asked the superior court to instruct the jury (1) that they should disregard the weight of the leaves harvested from his plants, and (2) that they could convict Maness of felony possession of marijuana only if the State proved that the *buds* from those plants weighed at least one pound.

The trial judge refused to give such an instruction. Instead, the judge instructed the jury on all three of the statutes discussed above: (a) the statutory definition of marijuana, (b) the statute defining the punishable weight of live plants as limited to the "commonly used form" of marijuana, and (c) the charging statute, AS 11.71.040(a)(3)(F), which prohibits possession of marijuana or any marijuana compound or mixture having an aggregate weight of one pound or more.

By simply instructing the jury on all three statutes without specifying the relationship

---

**2.** *Gibson*, 719 P.2d at 690.

**3.** Sixth-degree controlled substance misconduct under AS 11.71.060(a)(1).

**4.** Fourth-degree controlled substance misconduct under AS 11.71.040(a)(3)(F).

**5.** I note that Maness's contention is supported by the record in *Coffman v. State*, Alaska App. Memorandum Opinion No. 4541 (March 6, 2002). During the superior court proceedings in *Coffman*, a witness described an incident in which he and two accomplices broke into a trailer near Willow and stole approximately one hundred pounds of marijuana plants. According to this witness, he and his accomplices harvested the buds from the marijuana plants and threw away the leaves. *See Coffman*, slip opinion at page 36.

between them, the trial judge effectively allowed the defense and the prosecution to argue competing versions of what constituted the "commonly used form" of marijuana.

During the defense summation, Maness's attorney argued that the phrase "commonly used form" referred to the particular parts of the marijuana plant that are commonly ingested by marijuana users. Relying on the trial testimony that the buds were the only part of the plant that marijuana users cared about, the defense attorney argued that the jury could convict Maness only if they found that the buds harvested from his plants weighed one pound or more.

The prosecutor, on the other hand, reminded the jury that the statutory definition of marijuana includes both buds and leaves. The prosecutor told the jury that the phrase "commonly used form" referred, not to the particular parts of the plant that marijuana users might favor, but rather to the fact that marijuana is dried before it is used or sold. The prosecutor explained that this is why the police dried the marijuana harvested from Maness's plants before they weighed it. According to the prosecutor, the jurors could consider—and, by law, were obliged to consider—the weight of both the dried leaves and the dried buds harvested from Maness's plants when deciding whether Maness possessed one pound or more of marijuana.

Now it may be true, as this court said in *Atkinson*, that the jury must ultimately decide whether a particular batch of marijuana introduced into evidence by the State is (or is not) in its "commonly used form". But before the jury can decide this factual issue, they must know the meaning of this legal phrase; that is, the jurors must be apprised of the test that they are to apply when assessing whether marijuana is in its "commonly used form". The definition of "commonly used form" is a question of law. Thus, it is the trial judge's job to instruct the jurors concerning the defining criteria for recognizing marijuana in its "commonly used form".

I acknowledge that it is not easy to discern the precise meaning of "commonly used form". There is no clear relationship between the statute defining marijuana (AS 11.71.900(14)), the statute limiting the punishable weight of live plants to the resulting marijuana in its "commonly used form" (AS 11.71.080), and the statute that defines felony possession of marijuana as possession of a compound or mixture that contains some marijuana and that has a total weight of one pound or more (AS 11.71.040(a)(3)(F)). Moreover (as discussed below), the legislative history of this phrase sheds little light on this issue. But it was error for the trial judge to allow the parties to argue differing legal definitions of the phrase "commonly used form" and then leave it to the jury to decide what the law was.

The remaining question, of course, is to ascertain the law on this point. If Maness is correct in suggesting that the phrase "commonly used form" refers to the parts of the marijuana plant that, at the time of his offense, were commonly ingested by marijuana users, then his conviction must be reversed— because we have no idea whether the jury used this legal test when deciding Maness's guilt. If, on the other hand, the prosecutor was correct in arguing that "commonly used form" refers to the leaves, buds, and flowers harvested from a marijuana plant after they have been dried, then Maness's conviction should be affirmed—because the error in allowing Maness's attorney to argue an alternate version of the law (a version erroneously favorable to Maness) would be harmless.

AS 11.71.080—the statute that defines the punishable weight of a marijuana plant as the weight of the marijuana harvested from it "when reduced to its commonly used form"— was enacted as part of a broad re-writing of Alaska's drug laws in 1982. *See* SLA 1982, ch. 45, § 2, which added chapter 71 to the criminal code. This provision began life as part of 1981 SB 190.

In the legislative debates on SB 190, there is one portion that appears to explain the origin of AS 11.71.080. This portion occurs in the minutes of the House Finance Committee for February 2, 1982.[6] These Finance Committee minutes describe a colloquy be-

---

6. *See* Tape HFC 82–4, Side 1, beginning at log no. 384.

tween Representative Sam Cotten and Chief Prosecutor Daniel Hickey of the Department of Law. The two men are discussing how the normal aggregate weight test for compounds or mixtures would apply when marijuana was seized in the form of a live plant:

> Representative Cotten ... asked if Mr. Hickey had indicated [that] he wouldn't go by the strict letter of the law [but] instead ... would interpret [the law in a way] he thought ... would be more rational. Mr. Hickey agreed [that he had said this]. Representative Cotten said [that] this [approach wasn't consistent with] the bill. Mr. Hickey said [that] a constrained, technical reading of the aggregate weight test is going to mean that if a plant weighs in its entirety 4 ounces and has THC content, it could conceivably support prosecution under the bill. [*Note:* As originally drafted, AS 11.71 did not punish possession of marijuana in an amount less than 4 ounces.]

> Representative Cotten asked [if it was possible that] Mr. Hickey's intent wouldn't be to prosecute, but somebody else's might. Mr. Hickey agreed [that this was possible]. Representative Cotten suggested [that] the law ought to be re-written. Mr. Hickey said [that] maybe it not only ought to [be], but [could] be better written.

> Representative Cotten asked if [Mr. Hickey] had any suggestions. Mr. Hickey said [that] one [possibility] was to say "4 ounces or X-[number of] plants", but then you get into the battle of how big ... the plant [can] be. There was further discussion. Mr. Hickey said [that] a more reasonable approach would be to attempt to define the thing in terms of ... a substance, the aggregate weight of which contains marijuana, and the substance [as a] whole is in some kind of usable form, or can be reduced to [a] usable form that has [the specified] weight.

The upshot of this discussion was AS 11.71.080.[7]

But instead of incorporating Mr. Hickey's suggested wording ("usable form"), the legislature chose "commonly used form"—thus engendering the legal issue that Maness raises.

The colloquy in the House Finance Committee does not resolve this issue. However, I conclude that Maness's interpretation of the statute must be rejected because it is ultimately illogical.

Maness interprets AS 11.71.080 to mean that when the police find marijuana plants, the punishable weight of these plants is limited to the weight of the most commonly used part of the plants—the buds. Yet if the police arrived minutes after these same marijuana plants were harvested, the punishable weight of the marijuana would be determined by weighing all of the marijuana—seeds, leaves, buds, and flowers—in the grower's possession. This disparity appears to make no sense, and Maness offers no convincing rationale to explain it.

I therefore conclude that the State's interpretation of the statute is correct: when AS 11.71.080 refers to "marijuana ... reduced to its commonly used form", the statute is speaking of marijuana as defined in AS 11.71.900(14)—*i.e.*, fertile seeds, leaves, buds, and flowers—after this marijuana has been "reduced to its commonly used form"—*i.e.*, harvested from the plant and dried.

(I acknowledge that, in *Atkinson*, this court suggested that marijuana in its "commonly used form" might include small amounts of things that are not defined as "marijuana" under AS 11.71.900(14)—things such as stems and other marijuana detritus.[8] For purposes of resolving Maness's case, it is not necessary to decide whether that interpretation of the statute should be re-evaluated.)

As explained above, the jury in Maness's case was asked to choose between two competing interpretations of AS 11.71.080: the State's interpretation (which I conclude is correct) and Maness's interpretation (which,

---

7. On February 15, 1982 (*i.e.*, two weeks after this discussion), the House passed an amended version of SB 190—SB 190 am H (re-engrossed)—that contained a newly-drafted AS 11.71.080.

*See Alaska State Legislature Senate Bill History & Journal Index, 1981–82,* p. 0658.

8. *See Atkinson,* 869 P.2d at 494.

for the reasons explained here, I conclude should be rejected). Because statutory interpretation is a question of law, it was error to ask the jury to resolve this issue. But because this error could only have favored Maness, the error was harmless.

*When a person is convicted of possessing a pound or more of marijuana in their residence, can the State also convict them of the separate felony of maintaining a building for the keeping of controlled substances, AS 11.71.040(a)(5)?*

Maness was convicted of violating AS 11.71.040(a)(5), Alaska's "crack house" statute. This statute declares that it is a felony to "knowingly keep[] or maintain[] any ... dwelling, building, ... or other structure or place that is used for keeping or distributing controlled substances in violation of a felony offense [defined by AS 11.71] or AS 17.30". This language is derived from § 402(a)(5) of the Uniform Controlled Substances Act (1970).[9]

On appeal, Maness argues that this statute does not apply to people who are guilty of simply possessing controlled substances for personal use in their homes. (Maness was charged with possession of marijuana with intent to sell, but he was acquitted of this charge. His felony marijuana conviction was based on the fact that he possessed one pound or more.)

Maness did not raise this argument in the superior court. He therefore must demonstrate that the trial judge committed plain error by failing to recognize this purported limitation on the reach of AS 11.71.040(a)(5) and then instructing the jury about it.

I have previously expressed my concern that, under some circumstances, Alaska's double jeopardy clause might be violated if a defendant received separate convictions for possessing drugs and for maintaining a dwelling or building to keep those same drugs. See my concurrence in *Tunnel v. State*, Alaska App. Memorandum Opinion No. 4465 (October 3, 2001), slip opinion at 21–23.

Several other courts have recognized the danger that a broad interpretation of their "crack house" statutes would subject homeowners to double punishment for what is essentially one act of illegally possessing drugs. To avoid this double jeopardy problem, these states have construed their "crack house" statutes to allow a separate conviction only if the homeowner is guilty of engaging in continuing illegal drug activity other than simple possession of drugs. *See State v. Ceglowski*, 103 Wash.App. 346, 12 P.3d 160, 163 (2000); *Meeks v. State*, 872 P.2d 936, 939 (Okla.Crim.App.1994); *Howard v. State*, 815 P.2d 679, 683 (Okla.Crim.App.1991); *Barnes v. State*, 255 Ga. 396, 339 S.E.2d 229, 234 (1986); *Tucker v. State*, 19 Md.App. 39, 308 A.2d 696, 699–700 (1973).

*See also* Annotation, *Validity and Construction of State Statutes Criminalizing the Act of Permitting Real Property to be Used in Connection with Illegal Drug Activities*, 24 A.L.R.5th 428, § 8 (1994), which lists cases in which courts have held that "crack house" statutes require proof that the premises are used for the manufacture, sale, distribution, or use of controlled substances by someone other than the owner of the premises.

Nevertheless, the controlling Alaska precedent on this issue, *Davis v. State*, 766 P.2d 41, 46 (Alaska App.1988), appears to reject this position. Moreover, with regard to the decisions from other states, some of their statutes are worded somewhat differently from Alaska's, and thus these decisions are at least potentially distinguishable. (I note, however, that Washington and Georgia, like Alaska, have taken their statutes essentially *verbatim* from the Uniform Controlled Substances Act.)

For these reasons, I conclude that even though Maness has presented a colorable argument, he has not demonstrated plain error.

---

9. *See Dawson v. State*, 894 P.2d 672, 674 (Alaska App.1995); *Barnes v. State*, 255 Ga. 396, 339

S.E.2d 229, 231 (1986).