Thomas A. WILLIAMS, Petitioner,

v.

STATE of Alaska, Respondent.

Nos. A–9139.

Court of Appeals of Alaska.

Nov. 24, 2006.

---

Brian T. Duffy, Law Office of Dan Allan, Anchorage, for the Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellee.

Cynthia M. Hora and Christine M. Pate, Alaska Network on Domestic Violence and Sexual Assault, Sitka, as amicus curiae aligned with the State.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

COATS, Chief Judge.

This petition raises constitutional challenges to a statute, AS 12.30.027(b), that prohibits all persons charged with domestic violence from returning to the residence of the alleged victim while on pre-trial release—regardless of the circumstances of the offense and without any opportunity for judicial review.

Thomas A. Williams was charged almost two and one-half years ago with assaulting his wife of twenty-three years. He is apparently still awaiting trial. As required by AS 12.30.027(b), one of the conditions of his pre-trial release forbids him from returning to the residence he shared with his wife and daughter. Williams argues that this condition violates the equal protection clause of the federal and state constitutions because it burdens the liberty interests of individuals who pose no danger to the alleged victim. He also argues that his right to procedural due process was violated because he was deprived of a fundamental liberty interest—the right to live at home with his family—without the opportunity for a meaningful hearing. Because we agree that AS 12.30.027(b) violates Alaska's guarantee of equal protection of the laws, we reverse the decision of the district court.

*Facts and proceedings*

On April 21, 2004, the police responded to a report by a passerby that a man was strangling a woman in a house on Henderson Loop in Anchorage. When the police arrived at the house, they contacted Terese Williams. Williams said her husband, Thomas Williams, had grabbed her around the neck during an argument and pushed her to the ground. She said he kept a firm grip on her throat and squeezed for several minutes and that she was very scared. Then he let go and she got up. She was shaken and went to smoke a cigarette; her husband grabbed his bags and left. She said her husband worked in Point Mackenzie and stayed with a friend while he was there. She also told the police her husband had consumed some cough medicine and beers before the incident. The investigating officer noted that Terese Williams was "visibly shaken" and had a scratch on her chin, a finger impression under her right ear, and a small red mark on the left of her neck.

Based on these allegations, Thomas Williams was charged with fourth-degree assault.[1] The conditions of his pre-trial release barred him from contacting his wife or returning to the residence they had shared.

Several weeks after his release, Williams asked the court to modify his release conditions so he could have contact with his wife. His attorney said Williams and his wife had been together for more than twenty years and that both parties wished to renew contact. The State did not oppose the request. The prosecutor told the court that "in looking at Mr. Williams's record and the facts in this case, the State [is] confident or at least hopeful that it was an isolated incident." The court modified the bail conditions to allow contact, but emphasized that, by statute, Williams was still barred from the residence.

Several months later, Williams asked the court for permission to stay in the residence to care for the house and dog while his wife and daughter were in London. Williams's wife supported the request, and the State did not oppose. The court also granted that request.

On December 23, 2004—eight months after the incident—Williams, again with his wife's support, asked the court for permission to return to the residence for Christmas. He also filed a motion challenging the constitutionality of AS 12.30.027(b). Williams argued that the statute infringed his fundamental right to maintain his marital relationship and violated his rights to both due process and equal protection of the laws. He also argued that the statute violated the constitutional right of victims to be treated with dignity and fairness.

In support of Williams's request to return home for Christmas, Terese Williams told the court that she and Williams had been in contact for seven months, that they had seen

---

1. AS 11.41.230(a)(1).

each other regularly, and that maintaining separate residences was a financial burden. She said she and her husband had taken vacations together outside Alaska while this case was pending and that she did not feel her husband was a threat. She said their older daughter was coming home for the holidays and that it would be costly to find a place outside the residence for the family to be together.

Relying on AS 12.30.027(b), District Court Judge Sigurd E. Murphy denied Williams's request to return to the residence. The court then scheduled a hearing on Williams's motion challenging the constitutionality of the statute.

That hearing was held in January 2005. At the hearing, Terese Williams reiterated that she had been in regular contact with her husband and that she did not feel he was a threat. She said Williams was in counseling and that it was her wish that he return to the residence. She also asserted that the police and witnesses had exaggerated the seriousness of the incident. The State opposed the motion but did not present any evidence. The prosecutor simply observed that the domestic violence in the home had escalated, noting that Williams had threatened his wife with a fire poker in 2002 (he was convicted of disorderly conduct for that offense), and was now charged with assault for strangling his wife.

On February 2, 2005, Judge Murphy denied the motion. Judge Murphy interpreted the residence restriction in AS 12.30.027(b) as applying only in cases in which the court had already determined under AS 12.30.020 and AS 12.30.027(a) that release of the accused on his or her own recognizance or with an unsecured appearance bond would pose a danger to the alleged victim or other household member or not reasonably assure the accused's appearance in court. Having construed the statute in this manner, Judge Murphy found no deprivation of equal protection or due process. He also found that the bail condition barring Williams from returning home was appropriate given the facts of this case and Williams's previous conviction for disorderly conduct. Williams filed a

motion for reconsideration, which the court denied.

Williams then filed this petition for review, which we granted.

*Discussion*

*The residence restriction in AS 12.30.027(b) applies to all persons charged with or convicted of a crime involving domestic violence*

As noted above, Judge Murphy held that the residence restriction in AS 12.30.027(b) does not apply to every person charged with a crime of domestic violence. He adopted a narrower reading of the statute, ruling that courts are only required to bar a person charged with domestic violence from the home of the alleged victim if the court first finds that the person is too dangerous, or too much of a flight risk, to be released on his or her own recognizance or with an unsecured appearance bond.

We disagree with this reading of the statute. By its plain language, AS 12.30.027 applies to the release of all persons charged with or convicted of crimes of domestic violence, including those released without conditions:

(a) Before ordering release before or after trial, or pending appeal, of a person charged with or convicted of a crime involving domestic violence, the court shall consider the safety of the alleged victim or other household member. To protect the alleged victim, household member, and the public and to reasonably assure the person's appearance, the court may impose bail and any of the conditions authorized under AS 12.30.020, any of the provisions of AS 18.66.100(c)(1)-(7) and (11),[2] and any other condition necessary to protect the alleged victim, household member, and the public, and to ensure the appearance of the person in court, including ordering the person to refrain from the consumption of alcohol.

(b) A court may not order or permit a person released under (a) of this section to return to the residence of the alleged vic-

---

**2.** AS 18.66.100(c) lists the conditions that may be imposed in a domestic violence protective order.

tim or the residence of a petitioner who has a protective order directed to the person and issued or filed under AS 18.66.100–18.66.180.[3]

■ Under the first sentence of subsection (a), a court is required, in every domestic violence case, to consider the safety of the alleged victim or other household member before releasing the accused. Under the second sentence, the court *may* impose bail or any of the release conditions authorized under AS 12.30.020 or certain provisions of AS 18.66.100(c)—if those conditions are needed to protect the victim or others or to ensure the accused's appearance in court. Thus, both the first and second sentences of AS 12.30.027(a) encompass persons who are subjected to release conditions and persons who are released on their own recognizance or with an unsecured appearance bond. Because subsection (a) encompasses both groups, subsection (b), which applies to "a person released under (a)," does as well. We therefore conclude that AS 12.30.027(b) applies to all persons charged with or convicted of a crime involving domestic violence. However, in this case we are only asked to consider the application of AS 12.30.027(b) to a person on pre-trial release.

*Why AS 12.30.027(b) violates Alaska's guarantee of equal protection to the extent that it categorically forbids a person on pre-trial release for domestic violence from returning to the home of the alleged victim*

Williams argues that AS 12.30.027(b) violates the equal protection clause of the federal and state constitutions because it sweeps too broadly, infringing the liberty interests of persons who pose no threat of future violence.[4]

The State and Amicus Curiae counter that the residence restriction treats all members of Williams's class—persons on release on a charge of domestic violence—identically.

While this is true, it misses the point: Williams's claim is that the statute is impermissibly overinclusive, in that it burdens individuals who are not similarly situated with respect to the purposes of the statute.[5]

■ Article I, section 1 of the Alaska Constitution provides that all persons are "entitled to equal rights, opportunities, and protection under the law." In evaluating whether legislation violates this guarantee, we apply a flexible three-part test that is dependent on the importance of the rights involved:

> First, it must be determined at the outset what weight should be afforded the constitutional interest impaired by the challenged enactment.... Depending upon the primacy of the interest involved, the state will have a greater or lesser burden in justifying its legislation.
>
> Second, an examination must be undertaken of the purposes served by [the] challenged statute. Depending on the level of review determined, the state may be required to show only that its objectives were legitimate, at the low end of the continuum, or, at the high end of the scale, that the legislation was motivated by a compelling state interest.
>
> Third, an evaluation of the state's interest in the particular means employed to further its goals must be undertaken. Once again, the state's burden will differ in accordance with the determination of the level of scrutiny under the first stage of analysis. At the low end of the sliding scale, we have held that a substantial relationship between means and ends is constitutionally adequate. At the higher end of the scale, the fit between means and ends must be much closer. If the purpose can be accomplished by a less restrictive alternative, the classification will be invalidated.[6]

---

**3.** In *State v. Roberts*, 999 P.2d 151 (Alaska App. 2000), we rejected the claim that AS 12.30.027(b) only restricted the court from releasing a defendant to the residence of a petitioner who had obtained a protective order against the defendant. *Id.* at 154–55.

**4.** U.S. Const. amend. XIV, § 1; Alaska Const. art. I, § 1.

**5.** *See generally* Laurence H. Tribe, *American Constitutional Law* § 16–4, at 1450 (2d ed.1988).

**6.** *Alaska Pacific Assur. Co. v. Brown*, 687 P.2d 264, 269–70 (Alaska 1984); *see also State v. Erickson*, 574 P.2d 1, 12 (Alaska 1978).

■ As noted earlier, Williams asserts that he has a fundamental right to live at home with his wife and family while on pre-trial release and that any government infringement of that right must be strictly scrutinized.

We have previously subjected restrictions on marital association to heightened scrutiny. In *Dawson v. State*,[7] we observed that "[a] condition of probation restricting marital association plainly implicates the constitutional rights of privacy, liberty, and freedom of association and . . . must be subjected to special scrutiny."[8]

The State nevertheless argues that no fundamental right is at stake in this case because Williams's conditions of release permit him to see his wife—just not in their home. Hence, the State argues, the residence restriction has "at most a modest, incidental, and temporary effect" on the marital relationship. This argument understates the integral relationship between cohabitation and marriage. Moreover, apart from any burden imposed on Williams's relationship with his wife and family, Williams has a liberty interest in choosing his family living arrangements.

In *Moore v. City of East Cleveland*,[9] the United States Supreme Court addressed a city ordinance that limited the occupancy of a dwelling to members of a single family.[10] While that limitation in itself is unremarkable, this ordinance defined "family" so narrowly that it forbade Inez Moore from living in her home with her son and two young grandsons because the grandsons were cous-ins, not brothers.[11] When Moore refused to remove the offending grandson from her home, she was convicted of a crime.[12] The Supreme Court rejected the city's claim that it was required to uphold the ordinance if it bore a rational relationship to permissible government objectives:

> When a city undertakes such intrusive regulation of the family . . . the usual deference to the legislature is inappropriate. "This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." . . . . Of course, the family is not beyond regulation. But when the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation.[13]

This liberty interest does not disappear because a person has been charged with a crime.[14] We hold based on this authority that Williams has an important, if not fundamental, right to live in his home with his wife and family while on pre-trial release,[15] and that any state infringement of that right must be carefully scrutinized.[16]

■ There is no legislative history to illuminate the legislature's purpose in enacting the residence restriction in AS 12.30.027(b). But the State undoubtedly has a legitimate and compelling interest in preventing domestic violence—and in preventing a person accused of domestic violence from tampering

7. 894 P.2d 672 (Alaska App.1995).

8. *Id.* at 680 (citing *Thomas v. State*, 710 P.2d 1017, 1019 (Alaska App.1985)).

9. 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977).

10. *Id.* at 495–96, 97 S.Ct. at 1934.

11. *Id.* at 496–97, 97 S.Ct. at 1934.

12. *Id.* at 497, 97 S.Ct. at 1934.

13. *Id.* at 499, 97 S.Ct. at 1935–36 (quoting *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639–640, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974)).

14. *Cf. Martin v. State*, 517 P.2d 1389, 1396–97 (Alaska 1974) (recognizing that the legislature may not infringe on an accused's constitutional right of bail); *Dawson v. State*, 894 P.2d 672, 680 (Alaska App.1995) (recognizing that probationers retain a constitutional right to a marital association).

15. *See also Treacy v. Anchorage*, 91 P.3d 252, 264–66 (Alaska 2004) (ruling that juvenile curfew ordinance implicated fundamental rights to move about and to privacy).

16. *See Erickson*, 574 P.2d at 12.

with the alleged victim's testimony.[17] On the other hand, the government has no legitimate interest in barring a person who poses no appreciable risk of harming or intimidating the victim from returning to a shared residence.[18] Given the importance of the right to live with a member of one's family, we will invalidate the classification if we find an insufficiently tight fit between the purposes of the statute and the means used to accomplish those purposes and if less restrictive alternatives are available.[19]

The State argues that a blanket prohibition on returning to the alleged victim's residence is necessary because of the peculiar dynamics of domestic violence—in particular, the well-documented tendency of victims to remain with their abusers. The State argues that the victims of domestic violence are influenced by psychological and emotional forces that "too often make impossible an accurate assessment of whether the victim's safety can be assured if the defendant is allowed to return to [the] residence." The State concludes that a court's evaluation of whether a defendant poses a risk to the alleged victim is therefore likely to be "little more than an educated guess."

We agree that it can be difficult for judges to accurately predict whether a particular defendant will be dangerous in the future.[20] But judges confront this task "countless times each day throughout the American system of criminal justice"[21]:

> The trial court is not only the traditional but also the superior tribunal for the kind of information-gathering which a sound foundation for a bail ruling almost inevi-

bly requires. For it is there that, at a hearing, the judge can come face-to-face with the primary informational sources, and probe for what is obscure, trap what is elusive, and settle what is controversial. It is there, too, that the judge has at his disposal "the judicial machinery necessary to marshal the facts typically relevant to the release inquiry." [22]

As the State points out, courts are not obliged to credit a victim's assertion that her abuser is no threat—even if that testimony is undisputed. And in this case, in urging us to affirm the district court, the State lists ample circumstantial evidence Judge Murphy could have relied on to discredit Terese Williams's statements: the couple's lengthy marriage; Terese Williams's testimony about the financial strain of maintaining separate residences; Williams's prior conviction for threatening his wife with a fire poker; the fact that Terese Williams had resumed living with Williams after that prior incident; the eyewitness reports that Williams had strangled his wife; and the investigating officer's observations of Terese Williams's injuries.

Under the Alaska Statutes, once a court determines that a person charged with domestic violence poses a risk to the alleged victim, the court is authorized to impose numerous conditions of release (including removing the person from the victim's residence[23]). The court may appoint a third party custodian to supervise the accused person[24]; restrict the person's travel, association, or living arrangements[25]; require the person to return to custody after daylight

**17.** *See United States v. Salerno,* 481 U.S. 739, 749, 107 S.Ct. 2095, 2103, 95 L.Ed.2d 697 (1987) ("The government's interest in preventing crime by arrestees is both legitimate and compelling.").

**18.** *Cf. In the Matter of K.L.J.,* 813 P.2d 276, 280 (Alaska 1991) (quoting *In re Jay [R.],* 150 Cal. App.3d 251, 197 Cal.Rptr. 672, 681 (1983)) ("The state has no legitimate interest in terminating a parent's relationship with his child if he has not willfully neglected or abandoned that child.").

**19.** *See Matanuska–Susitna Borough Sch. Dist. v. State,* 931 P.2d 391, 396–97 (Alaska 1997); *Alaska Pacific Assur. Co.,* 687 P.2d at 269–70.

**20.** *See Covington v. State,* 747 P.2d 550, 553 n. 5 (Alaska App.1987); *Wood v. State,* 712 P.2d 420, 428 n. 7 (Alaska App.1986).

**21.** *Jurek v. Texas,* 428 U.S. 262, 275–76, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976).

**22.** *State v. Wassillie,* 606 P.2d 1279, 1289 (Alaska 1980) (Rabinowitz, J., dissenting) (quoting *United States v. Stanley,* 469 F.2d 576, 581 (D.C.Cir. 1972) (footnotes omitted)).

**23.** AS 12.30.027(a); AS 18.66.100(c)(3).

**24.** AS 12.30.020(b)(1).

**25.** AS 12.30.020(b)(2).

hours[26]; prohibit the person from committing, or threatening to commit, domestic violence, stalking, or harassment[27]; prohibit the person from contacting the victim[28]; direct the person to stay away from the victim's residence, school, car, or place of employment[29]; prohibit the person from possessing a firearm or consuming alcohol[30]; or impose any other condition reasonably necessary to assure the alleged victim's safety.[31] Before imposing any of these conditions, the court must assess the risk the accused person poses to the alleged victim, taking into account the possibility—perhaps the likelihood—that the victim has understated the risk of more violence. The State has advanced no evidence, and no convincing argument, that Alaska courts have failed, or must necessarily fail, at this task. Nor did the legislature make any findings on this issue. The legislative history reveals no discussion of the residence restriction in AS 12.30.027(b).

Furthermore, because of the broad definition of "a crime involving domestic violence," there is a substantial risk that the statute will burden the liberty interests of persons who pose no appreciable risk of future violence. Although "domestic violence" is normally understood to mean an assault committed by one domestic partner against the other, the offense actually encompasses a much broader range of persons and conduct.[32] In Alaska, a wide variety of crimes— extortion, reckless endangerment, trespass, and criminal mischief, to name a few[33]—are domestic violence crimes if they are committed by one household member against another.[34] And "household member" does not only mean people who are, or have been, involved in a sexual relationship; it also includes individuals who once lived together in any context or who dated in the past, or who are related by marriage or within the fourth degree of consanguinity.[35]

Of course, the residence restriction in AS 12.30.027(b) generally will only burden the liberty interest of a person who was living with the alleged victim at the time of the offense. But even within this narrower context, it is easy to imagine situations in which the condition would serve no legitimate governmental purpose. For instance, if a mother had an accident while driving with her infant daughter and was charged with reckless endangerment or assault for that offense, the court would be obliged to prohibit the mother from returning to the residence she had shared with her daughter.[36] Or, if Williams's nineteen-year-old daughter, who was living at home and attending college during this time, had recklessly burned her parents' front porch and been charged with criminally negligent burning for that offense, the court would be obliged to bar her from returning home for the duration of her pretrial release.[37]

Judge Murphy provided another example of how the residence restriction might create a significant hardship without advancing the State's interest in reducing domestic violence:

> *Court:* Let's say you have a case where a couple have been married for a long

---

26. AS 12.30.020(b)(3).

27. AS 12.30.027(a); AS 18.66.100(c)(1).

28. AS 12.30.027(a); AS 18.66.100(c)(2).

29. AS 12.30.027(a); AS 18.66.100(c)(4), (5).

30. AS 12.30.027(a); AS 18.66.100(c)(7).

31. AS 12.30.020(b)(7); AS 12.30.027(a).

32. *Bingaman v. State,* 76 P.3d 398, 407–08 (Alaska App.2003); *Carpentino v. State,* 42 P.3d 1137, 1141 (Alaska App.2002) (opinion on rehearing).

33. AS 11.41.520; AS 18.66.990(3).

34. AS 18.66.990(3).

35. AS 18.66.990(5)(B)-(F).

36. *See* AS 11.41.250 (reckless endangerment); AS 18.66.990(3)(A) (defining domestic violence to include a crime against the person under AS 11.41); AS 18.66.990(5)(E) (defining household member to include adults or minors who are related to each other up to the fourth degree of consanguinity).

37. *See* AS 11.46.430 (criminally negligent burning); AS 18.66.990(3)(D) (defining domestic violence to include criminally negligent burning); AS 18.66.990(5)(E) (defining household member to include adults or minors who are related to each other up to the fourth degree of consanguinity).

period of time. There's no criminal activity. They get along pretty well. As married couples often do, they have little fights and disagreements. Well, one night they both have been drinking and the husband calls the wife a fat pig or some other obnoxious statement, and the wife slaps him. He then goes ahead and calls the police. The police arrive.

Now ... I assume the prosecutor acknowledges that the [Anchorage Police Department] has a policy in domestic violence cases that if they go there on a call, they're going to arrest somebody, right?

*Prosecutor:* Yes, Your Honor.

*Court:* So let's say they arrest a woman for slapping her husband. They take her to jail and she's prohibited from returning to the home that she lived in for maybe a quarter of a century, and she has school-aged children to raise, and she is a home provider, and she prepares all the meals for the kids .... And the husband, who works full-time on the North Slope, or maybe [like Williams] he works in the valley in the Department of Corrections, isn't there to do that. There's been a total disruption to the home.

As the above examples illustrate, under Alaska's far-reaching definition of domestic violence, probable cause to believe a person has committed a domestic violence offense cannot necessarily be equated with probable cause to believe that the person poses an ongoing risk to the alleged victim's safety.

Even in Williams's case, which involves the more typical assault of a husband against a wife, it is possible to see how AS 12.30.027(b) might infringe an important liberty interest without advancing any significant governmental interest. Several weeks after the incident in this case, Williams asked the court to modify his release conditions to allow him to have contact with his wife so they could discuss their daughter and other household matters. Williams's wife supported that request, and the State did not

oppose it. The State told the court that "in looking at Mr. Williams's record and the facts in this case, the State [is] confident or at least hopeful that it was an isolated incident." Several months later—again with his wife's support, and with no opposition from the State—Williams received permission to stay in the family home while his wife was overseas. Shortly before Christmas, some eight months after the incident, Williams asked for permission to stay at home with the family for the holidays. Williams's wife told the court that she and Williams had been in regular contact for months, that they had traveled together on family vacations, that they wished to spend the holiday at home as a family, and that it would be a financial hardship to travel elsewhere. Judge Murphy denied the request, noting that the statute gave him no choice:

... I realize it works a hardship and, in some situations, I suspect that not having a family mend itself may cause more problems and exacerbate the whole issue that caused the domestic violence in the first place. I understand all that. I've been dealing with domestic violence in this state for almost a third of a century now.... I can't change the law though ... at this date. So he cannot go back to the residence.

Ultimately, Judge Murphy found that the release condition barring Williams from returning to the residence was appropriate in this case. But given the unrestricted contact Williams and his wife had outside the home, it is at least arguable that the prohibition on Williams returning to the residence was no longer serving its intended purpose.

Moreover, it appears that other jurisdictions have found less restrictive alternatives adequate to protect the victims of domestic violence. The Model Code on Domestic and Family Violence, which served as a blueprint for Alaska's 1996 Domestic Violence Prevention and Victim Protection Act (the law that authorized the residence restriction at issue in this case),[38] contains no blanket prohibition on a person charged with domestic violence

---

**38.** *See* Sponsor Statement and Summary of H.B. 314, introduced by Rep. Sean R. Parnell (House Judiciary Committee file).

returning to the residence of the alleged victim.[39] Rather, the Model Code gives courts discretion to remove the accused from the home if the court finds that doing so is necessary to protect the alleged victim.[40] Apparently no other state follows Alaska's rule. At least two states restrict a person charged with domestic violence from returning to the alleged victim's residence for one to three days after the incident—but the victim can waive that requirement.[41]

In its amicus brief, the Alaska Network on Domestic Violence and Sexual Assault points out that Alaska's domestic violence law removes discretion in a number of other ways. For instance, the police now must arrest an alleged perpetrator if they have probable cause to believe domestic violence occurred within the preceding twelve hours.[42] The arrestee must be held in custody until arraignment.[43] And although the arrestee has the right to a telephone call after arrest, he or she cannot call the victim.[44]

But these measures are aimed at defusing a potentially violent situation until a judicial officer can assess the danger to the alleged victim and, if necessary, impose appropriate conditions of release. The non-discretionary residence restriction potentially burdens an accused's liberty interest for a much longer period (Williams has apparently been barred from the family residence since April 2005), with no possibility for judicial review. As Williams observes, a ban on returning to the residence while on pre-trial release may be more burdensome than the sentence the person will receive if he ultimately is convicted of domestic violence—a situation that might encourage a defendant to give up the right to trial and enter a plea.

In *Dawson*, we recognized that restrictions on marital association might be justified in domestic violence cases.[45] But we also recognized that those restrictions should be carefully considered:

> In certain types of cases, such as cases involving domestic violence, limiting marital association would plainly be defensible. In any type of case, it is conceivable that such a limitation might be justified by case-specific circumstances demonstrating actual necessity and the lack of less restrictive alternatives. In such a case, however, to avoid unnecessary intrusion on marital privacy, it would seem appropriate to tailor a close fit between the scope of the order restricting marital association and the specific needs of the case at hand.[46]

We struck down the probation condition in *Dawson*—which forbade the defendant from any contact with his wife unless the contact was approved by his probation officer—after concluding that the court had made no apparent effort to tailor the scope of the condition to the specific circumstances of Dawson's case.[47] Similarly here, the State has failed to show that the less restrictive alternatives adopted by the Model Code and other jurisdictions—for instance, conditioning the residence restriction on a judicial finding, following a hearing, that the person charged with domestic violence poses an ongoing risk to the alleged victim—would fail to accomplish the government's interests. The legislation is thus impermissibly overinclusive: it prohibits all persons charged with crimes that meet the broad definition of domestic vio-

**39.** Model Code on Domestic and Family Violence, published by the National Council of Juvenile and Family Court Judges (1994).

**40.** *Id.* § 208(2)(c).

**41.** *See* Utah Code Ann. § 77–36–2.5 (providing that a person arrested for domestic violence may not be released on bail prior to the close of the next court day following the arrest unless he is ordered not to contact the victim or enter the victim's residence until the expiration of that time, but permitting the victim to waive that requirement); Wis. Stat. § 968.075(5)(a)(1) (requiring a person arrested for domestic violence to avoid the residence of the alleged victim dur-ing the 72 hours after arrest, but permitting the victim to waive that requirement).

**42.** AS 12.25.030(b); AS 18.65.530.

**43.** AS 12.30.027(e).

**44.** AS 11.56.755; AS 12.25.150(b).

**45.** *Dawson,* 894 P.2d at 680.

**46.** *Id.* at 680–81.

**47.** *Id.* at 681.

lence from returning to the victim's residence, even persons who pose no appreciable risk of assaulting the victim or tampering with the victim's testimony.[48]

In urging a contrary conclusion, the Amicus Curiae points to our decision in *Stiegele v. State*.[49] In *Stiegele*, we rejected an equal protection challenge to a statute that denied bail to all persons convicted of class A and unclassified felonies.[50] We reasoned that the legislature could legitimately conclude that the average unclassified or class A offender was more dangerous, and more of a flight risk, than the average class B or class C offender.[51]

■ *Stiegele* is distinguishable from this case. All the individuals denied bail under the statute at issue in *Stiegele* had been convicted of serious felonies. Individuals who have been convicted of a crime have no constitutional right to bail [52] and a diminished liberty interest.[53] The statute was therefore not subject to heightened scrutiny, and the fact that it may have reached some individuals who were not a danger or a flight risk, and missed some who were, did not make it fatally under- or overinclusive.[54]

By contrast, individuals charged with, but not yet convicted of, a crime involving domestic violence retain an important liberty interest in choosing their family living arrangements. Moreover, far more disparate individuals are burdened by this statute: the class includes individuals who have committed offenses ranging from murder to criminal mischief, and presumably some individuals

who are innocent of any crime. Given the reach of the statute, and the importance of the right infringed, even if the State could show (which it has not) that the average person charged with domestic violence poses an ongoing danger to the alleged victim, the statute would likely still burden enough people who are not dangerous to violate our constitution.

■ We recognize that we have a duty to construe a statute to avoid unconstitutionality if we can reasonably do so.[55] But the separation of powers doctrine "prohibits us from enacting legislation or redrafting patently defective statutes." [56]

On its face, AS 12.30.027(b) eliminates all judicial discretion to permit a person charged with a crime involving domestic violence to return to the residence of the alleged victim. But as we have pointed out, the category of "crime involving domestic violence" includes many crimes that have nothing to do with physical assault committed by one domestic partner upon another. That is, this category includes many crimes where the State has no apparent interest in barring the defendant from returning to the home of the victim. Although we could speculate that the legislature was unaware of the furthest reaches of this provision, and that it meant to reach only certain types of crimes (for instance, threats or assaults), or certain types of individuals (for instance, domestic partners), construing the statute to conform with our speculations "would be stepping over the line of interpretation and engaging in legislation." [57]

48. *Cf. Patrick v. Lynden Transport, Inc.*, 765 P.2d 1375, 1379 (Alaska 1988).

49. 685 P.2d 1255 (Alaska App.1984).

50. *Id.* at 1257–58.

51. *Id.*

52. *Hosier v. State*, 976 P.2d 869, 871 (Alaska App.1999); *Wassillie*, 606 P.2d at 1283.

53. *Monroe v. State*, 847 P.2d 84, 89–90 (Alaska App.1993); *see also McMillan v. Pennsylvania*, 477 U.S. 79, 84, 106 S.Ct. 2411, 2415, 91 L.Ed.2d 67 (1986) (noting that convicted felon's liberty interest is substantially diminished by a guilty verdict).

54. *Stiegele*, 685 P.2d at 1258.

55. *Bonjour v. Bonjour*, 592 P.2d 1233, 1237 (Alaska 1979); *Larson v. State*, 564 P.2d 365, 372 (Alaska 1977); *Hoffman v. State*, 404 P.2d 644, 646 (Alaska 1965).

56. *Bonjour*, 592 P.2d at 1238 (citing *State v. Campbell*, 536 P.2d 105, 110–11 (Alaska 1975), *overruled on other grounds by Kimoktoak v. State*, 584 P.2d 25 (Alaska 1978); *Gottschalk v. State*, 575 P.2d 289, 296 (Alaska 1978)).

57. *Gottschalk*, 575 P.2d at 296; *see also Myers v. Anchorage*, 132 P.3d 1176, 1186 (Alaska App. 2006) (invalidating a municipal drug paraphernalia ordinance because any re-write would be "so drastic that we believe it falls outside a court's proper sphere of action").

Moreover, even if we were to limit the reach of AS 12.30.027(b) to instances of assault by one domestic partner upon another, this narrower category would still include situations where the State's interest in preventing the defendant from returning home would be questionable at best—as Judge Murphy pointed out in his example.

We conclude that there is no obvious way to narrow the definition of "crime involving domestic violence" so that it applies only to cases where (1) the State has a demonstrable interest in barring the defendant from returning to the alleged victim's home and (2) the State's interest clearly outweighs the substantial personal liberty interest in choosing one's living arrangements. Accordingly, we cannot use our power of judicial construction to re-write the statute.

We therefore hold that AS 12.30.027(b), as applied to individuals on pre-trial release, violates article I, section 1 of the Alaska Constitution. (We express no opinion as to whether this statute is constitutional as applied to individuals on post-conviction release.[58]) Having invalidated subsection (b) as it applies to Williams, we find it unnecessary to address Williams's other challenges to the statute.[59]

The State urges us to avoid ruling on the constitutionality of AS 12.30.027(b) because Judge Murphy held that the residence restriction was, in any event, appropriate in Williams's case. But from our review of the record it is not apparent that Judge Murphy considered whether the government's interests could be served by the less restrictive alternatives authorized by the Alaska Statutes.[60]

Moreover, we do not view this as a close question and see no reason to defer a ruling. The issue has been thoroughly briefed by the parties and by Amicus Curiae. And, as the State has previously emphasized, bail release of those charged with domestic violence is a recurring issue that tends to evade review because defendants have their cases resolved, or violate a condition of release, before we have a chance to rule on the issue.[61] We think it reasonably likely that, in the absence of guidance from our court, judges engaged in the daily press of bail hearings will enforce the residence restriction as it plainly reads, even if they harbor serious reservations about its constitutionality or appropriateness in a given case.

*Conclusion*

For the foregoing reasons, we REVERSE the decision of the district court and REMAND the case for a hearing and new findings consistent with this opinion.

---

**58.** *See* AS 01.10.030 (providing for severability of unconstitutional provisions).

**59.** We also decline to address Williams's claim that the court erred in relying on hearsay evidence in imposing the residence restriction, finding that claim moot. *See State v. Roberts,* 999 P.2d at 153 ("Generally courts will not resolve an issue when it is moot.").

**60.** *See Dawson,* 894 P.2d at 680–81.

**61.** *See Roberts,* 999 P.2d at 153.